**INSURANCE CORPORATION OF AMERICA, Plaintiff,**

**v.**

**DILLON, HARDAMON & COHEN, et al., Defendants.**

**Civ. No. F 86–104.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 18, 1988.

See also 725 F.Supp. 1478

Charles T. Jennings, Mark R. Smith, Jennings, Maas & Stickney, Indianapolis, Ind., Edward J. Liptak, Livingston, Dildine, Haynie & Yoder, Fort Wayne, Ind., for Insurance Corp. of America.

Don A. Tabbert, Tabbert & Ford, Indianapolis, Ind., for Carnavest, Carnegie Intern. Corp., and Financial Planning Services Corp.

Alan I. Klineman, Craig Doyle, Klineman, Rose, Wolf & Wallack, P.C., Indianapolis, Ind., for Estate of John Dillon and Anna C. Dillon.

Robert W. Geddes, Hume, Smith, Geddes & Green, Indianapolis, Ind., for Dillon, Har-

damon & Cohen, Gregory F. Hahn, Gary D. Colip, Teresa E. Dearing, Estate of John Dillon and Anna C. Dillon.

Arthur G. Surgine, Jr., James J. Shea, Hunt, Sudehoff, Borror & Eilbacher, Fort Wayne, Ind., for Pacific Employers Ins. Co.

Michael J. Tosick, Greenfield, Ind., for W. Firnhaber, D. Firnhaber, J. Coons.

Dean E. Richards, Indianapolis, Ind., Vincent J. Backs, Beers, Maller, Backs, Salin & Larmore, Fort Wayne, Ind., Andrew K. Light, Scopelitis & Garvin, Indianapolis, Ind., for Bell Bros., Randy, Ronald & William Bell, Anthony & Joseph E. Cain, Larry Crowe, Catherine Crowe, Samuel Dyer, Doris Dyer, John R. Gillin, Ronald L. Hedrick, Chad Koppie, Kenneth Kindle, William Long, Charles E. Mathew, Ben F. Miller, Eugene Michael, Glenn Oberlander, Larry Oberlander, Paul Petri, Lee Seward, James Schroeder, Carol Schroeder, Clyde Sicker, D. Russell Stucker, George Warren, Jr., Gene Waibel, Patricia Waibel, Fred Spender, Edward Ander, Richard Ashby, Betty Bicknell, Eugene Streib, Betty Streib, Lawrence Castaldi, Joan Kyburz, Dale Mathew, Von Toebel Trust, David Stevenson, and Donald Morehouse.

Raymond J. Hafsten, Indianapolis, Ind., for James Furnish, Mildred Furnish, Linda Buck, T. Louis Graham, Sue H. Graham, Floyd Hayden, Freda Hayden, Dale E. Simpson, Suzanne Simpson, Mark Ellington, Thomas R. Stevenson, Larry Lichtsinn, Rita Lichtsinn, Joseph Watkins, Marcia Watkins, and Linda Ropeke.

ORDER

WILLIAM C. LEE, District Judge.

The Insurance Corporation of America has filed a motion for summary judgment which is now fully briefed. The court heard oral argument on March 10, 1988, and the motion is now ripe for ruling. For the following reasons, the motion will be granted in part and denied in part.

I.

*Summary Judgment Standards*

Summary judgment is proper "if the pleadings, depositions, answers to interrog- atories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 106 S.Ct. at 2512; *Valentine v. Joliet Tp. High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 106 S.Ct. at 2511.

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the

governing law. *Id.* 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 106 S.Ct. at 2512.

## II.

### *Brief Factual Background*

From June, 1980 through June, 1984, ICA issued four claims-made attorneys professional liability policies to the law firm of Dillon, Hardamon & Cohen (as the named insured) and to its attorneys (as additional insureds).[1] All four of the policies were "claims-made" policies and not "occurrence" policies.

ICA filed its rather daunting "complaint in interpleader, for declaratory judgment, and for injunction," with its two and one-half page caption, on March 20, 1986. As identified in the complaint, six lawsuits alleging legal malpractice have been filed. The complaint identifies these lawsuits as follows:

(1) *Bell Brothers, et al., Plaintiffs v. William Tully, et al., Defendants,* Cause No. L84–0072, United States District Court, Northern District of Indiana, Fort Wayne Division (the Bell Brothers lawsuit);

(2) *Carnavest, et al., Plaintiffs v. The Law Firm of Dillon, Hardamon & Co-* hen, *et al., Defendants,* Cause No. S283–1565, Marion Superior Court, Civil Division, Room 2 (the Carnavest lawsuit);

(3) *William C. Carbaugh, et al., Plaintiffs v. Mid–America Energy Oil and Gas Program (a Limited Partnership), et al., Defendants,* Cause No. IP84–905–C, United States District Court, Southern District of Indiana, Indianapolis Division (the Carbaugh lawsuit);

(4) *T. Louis Graham, Individually and as Representative of a Class of 250 Persons, et al., Plaintiffs v. Wendell Nance, et al.,* Cause No. IP82–872–C, United States District Court, Southern District of Indiana, Indianapolis Division (the Graham lawsuit);

(5) *Mid–America Energy II Oil and Gas Program, a Limited Partnership, Harley Ralston, and William E. Tully, General Partners, et al., Plaintiffs v. Gary C. Colip, et al., Defendants,* Cause No. 34,888, Johnson Circuit Court (the Mid–America lawsuit); and

(6) *Walter C. Firnhaber, Individually and as a Representative of a Class of 460 Individuals, et al., Plaintiffs v. PAC Financial Corporation, et al., Defendants,* Cause No. 2S84–064, Hamilton County Superior Court, Room 2 (the Firnhaber lawsuit).

Noting that two of these lawsuits had settled for $165,000 [2] and arguing that all four of the insurance policies issued provide only one million dollars in total coverage, ICA paid into the Registry of this court the sum of $835,000, a sum it contends represents the total aggregate limit of liability for all of the claims asserted against the defendants-insureds not already paid in settlement.

These are the barest skeletal facts. Many more facts will be added in conjunction with the analysis of particular issues which will add much flesh to this brief factual background. But a recitation here of all of the pertinent facts which bear on

---

**1.** The four policies covered the following periods:

| | |
|---|---|
| Policy L5609 | From 6/24/80 to 6/24/81 |
| Policy L8863 | From 6/24/81 to 6/24/82 |
| Policy L12421 | From 6/24/82 to 6/24/83 |
| Policy L15393 | From 6/24/83 to 6/24/84 |

**2.** The Carbaugh lawsuit was settled for $60,000 and the Mid–America lawsuit was settled for $105,000.

the issues being decided in this motion, issues relating to the extent of insurance coverage, would make little sense without the context provided by the subsequent analysis.

## III.

### *Analysis*

Two issues are presented: how much total coverage does a policy provide in one year and in which policy years did each of the six defendant claimants present their claims? Both issues are governed by Indiana law and the first issue is almost purely a matter of contract interpretation. The second issue, like the first, involves contract interpretation, but unlike the first, is extremely fact specific.

### A. *Amount of Coverage Provided by a Policy*

This issue turns upon two provisions in the insurance policy.[3] The first provision is found on the front page of the policy, the declarations page, under item four and states:

Maximum Amount: 1,000,000 (Per Occurrence)
Maximum Amount: 1,000,000 (Aggregate)

The second provision is found midway through the policy under the heading "Limits of Liability."

The Company's limit of liability for damages for any one claim shall not exceed the maximum amounts stated in the declarations page(s), with such amounts being in addition to the cost of defense or bonds.

The many pages of briefing which have been devoted to the issue of coverage turn upon the language quoted above.

ICA argues that the language of the policy is clear and unambiguous and provides $1,000,000 in aggregate coverage per policy year. As a corollary to this argument, ICA argues that the interpled claimants, who are not parties to the insurance policy, lack "standing" to argue that the policy language is ambiguous, where the insurer and insureds agree that $1,000,000 per year is available. Finally, ICA argues that even if the court considers the claimants' arguments, the evidence will show, without genuine issues of material fact,

that the policy only provides $1,000,000 in aggregate coverage per policy year.

The interpled claimants are flabbergasted at the notion that they have no "standing" to argue that the policy language is ambiguous. They argue, with unanimity, that they were hauled into this forum when ICA initiated this action, so that they, as unwilling interpled claimant defendants, clearly have "standing" to make whatever arguments they wish. They further argue, although the unanimity breaks down at this point, that the language of the policy is meant to provide more than $1,000,000 aggregate coverage per policy year.

ICA's "standing" argument has caused considerable consternation. No doubt the use of the word "standing" should immediately be abandoned, or at least clarified. "Standing" is a component of the constitutional case-or-controversy analysis and, thus, bears on the power of a court to entertain a party's complaint. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The focus is on the party, not the claim. To have standing, the party must have suffered some actual or threatened injury; the injury must be traceable to the challenged action; and the injury must be redressable by a favorable decision. *Id.* Clearly the interpled claimants have "standing" in this sense.

ICA's argument is not a "standing" argument at all. It is simply an argument based upon principles of Indiana contract law. In Indiana, insurance contracts are subject to the same rules of interpretation as are other contracts. *Eli Lilly & Co. v. Home Insurance Co.,* 482 N.E.2d 467, 470 (Ind.1985). The ultimate goal in interpreting a contract is to ascertain and enforce the intent of the parties. *Asbury v. Indiana Union Mutual Ins. Co.,* 441 N.E.2d 232 (Ind.App.1982). Focusing on this goal, ICA argues that where, as here, the insurer and the insureds agree on the interpretation of a particular provision ($1,000,000 aggregate liability), their agreement ends the inquiry.

---

**3.** While there are four policies in question, the pertinent provisions are identical.

This argument has much to recommend it. It honors the meeting of the minds between the parties to the insurance contract. If the parties agree on what they meant, who is the court to step in and begin asking questions, when its ultimate goal is to enforce the parties' intent? And should the parties not receive the benefit of their bargain? Of course they should! The risk understood and assumed is the risk insured. If even the insureds agree upon the amount of coverage they bargained for (and it is they who have the most to lose if that amount is too small—they may be held personally liable), how can the court do other than adopt their agreement?

There is no real question that the insurer and the insureds agree that the policy provides $1,000,000 aggregate coverage per policy year. While the pleadings are inconclusive on this point,[4] none of the insureds have submitted any evidence to refute ICA's submission of proposed findings of fact. Those proposed findings, made pursuant to Rule 11 of the Local Rules for the United States District Court for the Northern District of Indiana, are taken as true unless specifically controverted by the statement of genuine issues, filed in opposition.[5] And they clearly state that the policy provides $1,000,000. Moreover, it is well established that a party cannot rest upon its pleadings in a summary judgment proceeding, but rather, must bring forth competent evidence to create a genuine issue of material fact. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). The insureds have made no attempt to do that in this case— they have agreed that each policy provides $1,000,000 in total coverage.

But even if the insureds disagreed, their disagreement would not create an ambiguity in the language of the contract. In Indiana, an insurance policy is ambiguous only "if *reasonable persons* may honestly differ as to the meaning of the policy language." *Eli Lilly*, 482 N.E.2d at 470 (emphasis added). The existence of a "controversy as to the meaning of an insurance policy does not establish that such an ambiguity exists." *Stockberger v. Meridian Mutual Ins. Co.*, 182 Ind.App. 566, 395 N.E.2d 1272, 1277 (1979), *quoting Taylor v. American Underwriters, Inc.*, 170 Ind. App. 148, 352 N.E.2d 86, 89 (1976). The plain and ordinary meaning of the words of a policy govern its interpretation. *Asbury*, 441 N.E.2d at 236. The meaning of a contract must be derived from a consideration of all of its terms harmonized together, not read in isolation. *Evansville–Vander-*

---

4. The pleadings are a mixed bag. The answer of defendants Dillon, Hardamon & Cohen, Gregory F. Hahn, Gregory D. Colip and Teresa E. Dearing, admits at paragraph I.1., for example, the allegations in paragraph 3.8 of the complaint, that the proceeds left to settle all the remaining claims total $835,000. Yet III.5. of the same answer states that these same defendants are without sufficient information to respond to the allegations contained in 3.1 of the complaint, that $1,000,000 of aggregate coverage exists under each policy. And paragraph III.6. of the estate of Dillon's answer also denies the allegations of aggregate coverage in paragraph 3.1 of the complaint. There are other denials relating to coverage in the estate of Dillon's answer. *See* paragraphs III.8. and IV.7. More could be said—suffice it to say that the insured defendants' answers do not conclusively admit the issue of aggregate coverage.

5. Local Rule 11 states:
   In addition to a separate supporting brief as required by Rule 9 of these Rules, there shall be served and filed with each motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, a statement of materi-

al facts as to which the moving party contends there is no genuine issue, proposed conclusions of law, and a proposed summary judgment. Any party opposing the motion shall, within fifteen (15) days from the date such motion is served upon him, serve and file any affidavits or other documentary material controverting the movant's position, together with an answer brief and a concise "statement of genuine issues" setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated.
   In determining the motion for summary judgment, the court will assume that the facts as claimed by the moving party are admitted to exist without controversy, except as and to the extent that such facts are actually in good faith controverted in the "statement of genuine issues" filed in opposition to the motion, as supported by the depositions, answers to interrogatories, admissions, and affidavits on file.
   All motions for summary judgment shall be considered as submitted for ruling without oral argument unless the court otherwise directs.

*burgh School Corp. v. Moll,* 264 Ind. 356, 344 N.E.2d 831, 837 (1976).

As noted above, the issue regarding total aggregate liability turns upon two separate sections of the policy. The question is how the terms "aggregate" and "occurrence" on the declarations page interact with the phrase "any one claim" in the limits of liability section. The answer to that question is abundantly clear. The policy provides $1,000,000 "per occurrence" each policy year. If one occurrence gives rise to four claims, for example, the total coverage for those four claims is still $1,000,000.[6] If an occurrence gives rise to only one claim, $1,000,000 is still available. There is $1,000,000 per occurrence in a policy year.

The language "$1,000,000 (Aggregate)," found on the declarations page *directly under* "$1,000,000 (Per Occurrence)," modifies the "$1,000,000 (Per Occurrence)" language. Without this language the policy would provide $1,000,000 per occurrence for an unlimited number of occurrences, leaving no cap on the insurer's exposure to liability. With this language, the insurer's total exposure is $1,000,000 per policy year regardless of the number of claims and occurrences.

The language in the "Limits of Liability" section, that liability for damages for "any one claim" shall not exceed the maximum amounts stated in the declarations page, means just what it says. If one claim is presented only $1,000,000 of coverage is available. ICA makes an important distinction between the words used ("any one claim") and words which could have been used (i.e., each claim). While the claimant defendants consider the distinction a tortured semantical one, the court finds it completely reasonable. In fact, any other

interpretation would, as the subsequent discussion will show, render the plain and unambiguous language of the policy meaningless and would fail to harmonize the language on the "Limits of Liability" page with the language on the "Declarations" page. And as noted earlier, the court must accept an interpretation which harmonizes the provisions of a policy. *Moll,* 344 N.E.2d at 837.

In what seems like a clear attempt to create ambiguity where none really exists, all of the claimant defendants argue that the "any one claim" language in the "Limits of Liability" section must be read in conjunction with the "$1,000,000 (Aggregate)" language on the "Declarations" page, to provide a total amount of coverage in excess of $1,000,000. The Bell Brothers, Carnegie and Graham claimant defendants argue that the term "aggregate" modifies the phrase "any one claim," so that the policy provides $1,000,000 aggregate coverage for each claim. Not only does this argument ignore the plain language of the policy (the policy says "any one claim," not each claim), it requires the court to throw out the "$1,000,000 (Per Occurrence)" limitation. As noted earlier, one occurrence may give rise to many claims.[7] If the policy provides $1,000,000 for each claim and three claims arise out of one occurrence, this interpretation would result in $3,000,000 coverage for one occurrence. Such an interpretation demolishes the $1,000,000 per occurrence limit, thus failing to harmonize the policy's provisions.

The Firnhaber claimant defendants also argue that the term "aggregate" modifies the phrase "any one claim." But they see "any one claim" as any one class claim. In other words, aggregate liability for any

---

6. As ICA correctly notes, a claim is not the same as an occurrence. *See, e.g., Atlas Underwriters v. Meredith–Burda, Inc.* (1986), 231 Va. 255, 343 S.E.2d 65, 67 (one incident or transaction frequently gives rise to many claims); *Burlington County Abstract v. QMA Associates* (1979), 167 N.J.Super. 398, 400 A.2d 1211, 1214 (one cause can, and frequently does, generate many claims); *San Pedro Properties, Inc. v. Sayre & Toso, Inc.* (1962), 203 Cal.App.2d 750, 21 Cal. Rptr. 844, 847 ("'claim' is not synonymous with 'accident' or 'occurrence' under the circumstances of this case").

7. There are three occurrences in this action. Dillon, Hardamon & Cohen's preparation of the Mid–America prospectus is the first occurrence and it gave rise to the Mid–America, Carbaugh and Bell Brothers claims. The second occurrence is Dillon, Hardamon & Cohen's preparation of documents concerning the Carnegie Corporation and it gave rise to two claims—the Graham and Carnegie claims. Lastly, Dillon, Hardamon & Cohen's preparation of the PAC financial corporation documents gave rise to the Firnhaber claim.

one class claim shall not exceed $1,000,000. Thus, if 10 claims make up one class claim they argue that the policy provides $1,000,000. But, if two class claims are presented, they argue that $2,000,000 is available. The problem with this argument is twofold: the policy does not say "any one class claim," it says "any one claim." Second, such an interpretation of the phrase "any one claim" is not in harmony with the per aggregate language. Two or three occurrences would undoubtedly give rise to a number of class claims, in which case total liability would exceed $1,000,000 per aggregate. This argument must therefore be rejected.

■■■ The only reasonable interpretation of the language of the policy, which seems very clear and completely unambiguous, is that $1,000,000 is provided for each occurrence within a policy year. If there is more than one occurrence, total liability is $1,000,000 for all occurrences. *See, e.g., Unigard Mutual Ins. Co. v. Abbott*, 732 F.2d 1414, 1418 (9th Cir.1984) (to the same effect, but finding ambiguity in an umbrella provision). And it does not matter how many claims are presented—the limit is still $1,000,000 for all occurrences. The phrase "any one claim" simply means that liability for any one claim shall not exceed $1,000,000. This language contemplates a situation not present here; that only one claim is presented in a policy year. It does not mean that each claim or each class claim has aggregate coverage of $1,000,000.

This interpretation of the policy gives its words their plain and ordinary meaning. *Asbury*, 441 N.E.2d at 236. It harmonizes all of the terms of the policy, *see Moll*, 344 N.E.2d at 837, and it honors the parties' intent as expressed in the contract. *Asbury*, 441 N.E.2d at 236 citing *Stockberger v. Meridian Mutual Insurance Co.*, 182 Ind.App. 566, 395 N.E.2d 1272 (1979). The court is convinced that reasonable persons could not come up with a different interpretation and it is a reasonable person's honest differences as to policy language that matters. *See Eli Lilly*, 482 N.E.2d at 470.

### B. The Presentation of the Claimant Defendants' Claims

Having determined that $1,000,000 is provided in each policy year, the court must now determine when each of the claims was presented. If, as ICA contends, all six of the claims were presented in one policy year, then the defendant claimants must share the amount of coverage available for that year—$1,000,000. This issue requires a two step analysis. First, what does the policy mean by presentation of a claim? Second, applying that meaning (or definition), can the court determine when each of the six claims was presented, or do genuine issues of material fact make that determination impossible?

ICA's "standing" argument raises its head again here. ICA argues that both it and its insureds agree that all six claims were presented during policy year 1983–1984, policy L–15393, and that their agreement is all that matters, so that the defendant claimants have no "standing" to argue differently. But as noted earlier, ICA's "standing" argument is not really a standing argument at all, but rather, only an argument that where the parties to a contract *agree to its terms*, their agreement ends the court's inquiry. This is because the court's responsibility, in interpreting a contract under Indiana law, is to enforce the intent of the parties. *Asbury*, 441 N.E.2d at 236. When the intent is agreed upon the court has fulfilled its responsibility.

ICA's "standing" argument cannot be used to foreclose inquiry on the issue of when each of the claims was presented because this issue is not purely an issue of contract interpretation. The issue of aggregate liability discussed earlier, turned solely on the terms of the contract, so that an agreement on that issue by the parties manifested their intent. The issue of when each claim was presented turns upon a myriad of facts and is not just a matter of contract interpretation. Agreement between the insureds and ICA on when each of the claims was presented does not indicate their mutual intent or any meeting of the minds regarding the language of the contract. Thus, their agreement does not end the inquiry.[8]

---

**8.** The court would note that while agreement on        the meaning of the language regarding presenta-

The real question is not whether the insureds agree with ICA on when each claim was presented, but rather, whether there are any genuine issues of material fact in dispute in that regard, which preclude summary judgment. The claimant defendants can raise issues of material fact. As noted earlier, substantive law determines which facts are material. In this case that means that Indiana law on the issue of claims presentation determines which facts are material. *Anderson,* 106 S.Ct. at 2510. If material facts are identified they must raise genuine issues regarding the presentation of a claim. Fed.R.Civ.P. 56(c), (e). That requires more than a metaphysical doubt, *see Matsushita,* 106 S.Ct. at 1356; there must be evidence to present a sufficient disagreement to require submission of the case to a fact finder. *Anderson,* 106 S.Ct. at 2512.

Having identified the real issues the court will now turn to the question: what does presentation of a claim mean? After answering that question the court will go on to examine the evidence regarding the presentation of each of the six claims.

### (i) The Meaning of Presentation of a Claim

Each of the policies in question contains a section which states that coverage shall only apply to claims presented during the applicable policy period.[9] The policies also contain a "condition" which states that the insured shall provide certain information to the insurer after an injury becomes known.[10]

The term claim is not defined anywhere in the policy. Of course, that does not lead to the conclusion that the term is ambiguous. *See Hoyt v. St. Paul Fire & Marine Ins. Co.,* 607 F.2d 864 (9th Cir.1979); *Bensalem Tp. v. Western World Ins. Co.,* 609 F.Supp. 1343, 1348 (E.D.Pa.1985). Ambiguities only exist where reasonably minded people have honest differences. *Eli Lily,* 482 N.E.2d at 470. The term claim is one of the commonest terms in the law. *See St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Guaranty Co.,* 2 Haw. App. 595, 637 P.2d 1146 (1981), *quoting* 8 Bac.Abr.,* where Lord Coke said "the word demand is the largest word in the law, except claim." The word claim is derived from the Latin word clarmor, "meaning a call or demand. In its ordinary sense the term imports the assertion, demand or challenge of something as of a right...." *San Pedro Properties, Inc. v. Sayre & Toso, Inc.,* 203 Cal.App.2d 750, 21 Cal.Rptr. 844 (1962), *quoting Supera v. Moreland Sales Corp.,* 28 Cal.App.2d 517, 521, 82 P.2d 963 (1938). So the court does not think that the word claim can be considered ambiguous (and then construed in favor of the insureds) simply because ICA unwittingly failed to define it.

"The case law generally supports the conclusion that, for purposes of determining coverage under a 'claims made' policy, a 'claim' is 'a demand for something as a right.'" *See Bensalem,* 609 F.Supp. at 1348. *Black's Law Dictionary* defines claim as a "[d]emand for money or property, e.g. insurance claim." *Black's Law Dictionary* (5th ed. 1979). *See Peabody Coal Co. v. Ridenour,* 515 N.E.2d 1163 (Ind.App.1987) (using *Black's Law Dictionary* to construe the plain and ordinary meaning of the words "adjacent" and "inci-

---

tion of a claim would be important, the record does not disclose such an agreement.

9. The provision is the same in each policy and reads as follows:

IV  Policy Period

(a) This policy is written on the "claims made" form of coverage. Thus, it shall only apply to claims prsented during the policy period stated in the "declarations" page(s), provided that the acts or omissions complained of occurred after the effective date during the same policy period or a preceding ICA policy period where no break in coverage has occurred.

10. The pertinent language reads as follows:

CONDITIONS

1. Upon the insured becoming reasonably aware of any alleged injury, written notice containing the most complete information available with respect to the circumstances, time and place thereof, and name and address of the injured party shall be given to the Company as soon as practicable. If such alleged injury results in a claim being filed in court, the insured shall immediately forward to the Company the original or copy of any and all papers relating to said claim.

dental" as used in a statute). Reasonably minded people would have no trouble figuring out what the word claim means *when that word stands alone without some other word or phrase which would suggest an odd or unusual meaning.* This is particularly true in the context of a claims made policy.

A claims made policy, as noted earlier, is distinguishable from an occurrence policy. *See Sherlock v. Perry,* 605 F.Supp. 1001, 1003–04 (E.D.Mich.1985). The difference has been described as follows:

> The major distinction between the "occurrence" policy and the "claims made" policy constitutes the difference between the peril insured. In the "occurrence" policy, the peril insured is the "occurrence" itself. Once the "occurrence" takes place, coverage attaches even though the claim may not be made for some time thereafter. While in the "claims made" policy, it is the making of the claim which is the event and peril being insured and, subject to policy language, regardless of when the occurrence took place.

Kroll, *The Professional Liability Policy "Claims Made",* 13 Forum 842, 843 (1978). Where a policy is a claims made policy, which is specifically written so that coverage attaches when a claim is made, it seems particularly appropriate to give the word claim its ordinary meaning.

■ A claim is a demand for money or property or some specific remedy. The word does not, *standing alone,* include a mere request for information or an explanation. *Hoyt v. St. Paul Fire & Marine Ins. Co.,* 607 F.2d 864, 865–66 (9th Cir.1979) (a letter written by the injured party requesting information or an explanation from the insured is not a demand and does not constitute a claim). *Cf. Phoenix Ins. Co. v. Sukut Const. Co.,* 136 Cal.App.3d 673, 186 Cal.Rptr. 513 (1982) (demand that lawyer correct problem in mechanic's lien

constitutes claim); *Katz Drug Co. v. Commercial Standard Ins. Co.,* 647 S.W.2d 831 (Mo.Ct.App.1983) (demand that employer restore employee's insurance coverage constitutes claim). Neither does it, *standing alone,* require the filing of a lawsuit. *Katz,* 647 S.W.2d at 835–38. And the policies in question in this case do not require the insured to give notice to ICA as a prerequisite to the making of a claim. The word claim requires a demand for money or property or some specific relief, accompanied by an allegation of negligence, malpractice, or some kind of wrongdoing.

Everything that has been said thus far about the meaning of the word claim applies only to the word standing alone. The meaning of the word may, of course, be modified if provisions in the policy change its ordinary meaning. One way for the word claim to be modified is through a policy's notice provision. The claimant defendants, or at least some of them, argue that Condition 1 of the ICA policies gives the word claim a different meaning than the ordinary one expressed above.

In *Sherlock v. Perry,* 605 F.Supp. 1001, 1003 (E.D.Mich.1985), the insurance policy specifically defined the word claim so that a claim was made when the insured became aware of any act or omission which could reasonably give rise to a claim, and gave written notice to the insurer.[11] The policy required no demand, only written notice to the insurer. *Id.* The Graham class asks the court to adopt this definition of the word claim, arguing that Condition 1 of the ICA policy is analogous to the language in the policy construed in *Sherlock.* But the language in *Sherlock* is not analogous. That language specifically dealt with when a claim was first made during the policy period, *Sherlock,* 605 F.Supp. at 1003, whereas the language in the policies at issue here deals with "conditions" and does not intimate that the giving of notice by

---

**11.** The pertinent provisions of the policy which the court construed in *Sherlock* reads as follows:

> A claim is first made during the policy period or extended reporting period if:
> a) during the policy or extended reporting period the insured shall have knowledge or

become aware of any act or omission which could reasonably be expected to give rise to a claim under this policy and shall during the policy period or extended reporting period give written notice thereof to the Company in accordance with Conditions VII.

*Sherlock,* 605 F.Supp. at 1003.

the insured to the insurer shall constitute a claim. The policy in *Sherlock* is entirely different than the one before the court. *Sherlock* does not, therefore, provide a basis for modifying or changing the ordinary meaning of the word claim.

The claimant defendants also rely upon the important case of *J.G. Link & Co. v. Continental Casualty Co.*, 470 F.2d 1133 (9th Cir.1973), wherein the court held that if the insurance policy in question was considered a claims made or discovery policy (there was a dispute about whether the policy was an occurrence policy or a claims made policy) the language of the policy was ambiguous, so that a claim was made when the insured received "information as to his alleged errors, omissions, or negligent acts...." *Link*, 470 F.2d at 1135, 1137–38. In *Link*, a condition of coverage was that the insured give written notice to the company after receiving information as to alleged errors, omissions, or negligent acts. *Id.* The content of the information required to trigger the insured's duty was not spelled out by the policy and the court accordingly declared the claim provision ambiguous.

■ While *Link* bears significant similarity to the case at bar, there are some key differences which convince the court that a different conclusion than the one reached in *Link* is mandated in this case. First, in *Link*, one of the major issues was whether the policy was a claims made or occurrence policy. That is not an issue in this case; the policy here is clearly a claims made policy. That distinction is significant because the risk insured in a claims made policy is the risk that a claim will be brought, whereas the risk insured in an occurrence policy is the occurrence itself. Thus, the uncertainty in *Link* about which

kind of policy the policy was was very important.

The most important distinction, however, is the distinction in the policy language. The second sentence in Condition 1 of the ICA policy indicates that notice of an alleged injury is something different from a claim. See fn. 9, *supra*. This was the situation in *Bensalem Tp. v. Western World Ins. Co.*, 609 F.Supp. 1343, 1348 (D.C.Pa.1985). In *Bensalem*, the notice provision, like the notice provision in this case, required the insured to notify the insurer upon receipt of information from any party that it was the intention of that party to hold the insured responsible for any wrongful act.[12] The policy next provided, in the same way as the policy in this case, that if a claim was made, the insured should inform and cooperate with the insurer. *Id.* The court held that notice of an alleged injury is something distinct from and antecedent to a claim. *Id.* Thus, the insured in *Bensalem* could give notice to the insurer of a wrongful act and still not present a claim.

■ The language in the policy in this case mirrors the language used in the policy at issue in *Bensalem*. The second sentence of Condition 1 makes it quite clear that a claim is something distinct from mere awareness or even from written notice of an alleged injury. See f.n. 10, *infra*. Simply becoming aware of an alleged injury is not enough to amount to a claim. Awareness is not a demand and the use of the word claim, unless modified by other language, requires that a demand be made. While the word claim is not defined in the policy, it is not inherently ambiguous. As noted earlier, reasonable persons must come up with honest differences before an ambiguity can be said to exist. *Eli Lily*,

---

**12.** The policy provisions in *Bensalem* read as follows:

(a) If during the policy period ... the Public Entity or any insureds shall receive written or oral notice from any party that it is the intention of such party to hold the insureds responsible for a Wrongful Act, they shall give written notice to the Company ... as soon as practicable, but in no event exceeding one year, then any claim which may subsequently be made against the insureds arising out of

such Wrongful Act shall, for the purpose of this policy be treated as a claim made during the policy year in which such notice was given during the extended discovery period, as a claim made during the last policy year. (b) The Public Entity ... shall, as a condition precedent to their rights under this policy, give the Company notice in writing as soon as practicable of any claim made and shall give the Company such information and cooperation as it may reasonably require.

482 N.E.2d at 470. Mere argument is not enough. Given the language of the policy, and particularly the second sentence of Condition 1, the court concludes that the word claim is not ambiguous and that that word should be given its ordinary meaning. A claim is made, within the meaning of the policies in question, only when a demand for money or property or some specific relief is made.

### (ii) When Each of the Six Claims Was Presented

Having determined that a claim is presented when a demand for money or property or some specific relief is made, the court must now examine the facts to determine when each of the six claims was presented.

### (a) The Carnegie, Graham, and Firnhaber Claims

The insureds, the insurer, and each of these three claimant defendants agree that these claims were presented under policy L–15393, policy year 83–84. That agreement is manifested in the claimant defendants' own cross-motions for summary judgment on this issue and in the responses which have been filed to ICA's motion. This agreement is quite important and reveals much about the genuineness of any material facts which the other claimant defendants may attempt to put into dispute. After all, the insureds and the claimants have the most to lose by taking the position that these three claims were presented under policy L–15393. To the extent that claims can legitimately be spread out over other policy years more total coverage is available. This explains the insistence by the Firnhaber class that only its claim was presented under L–15393. The court is not suggesting that only the insurer and the particular claimant involved have "standing" to argue about when that claimant presented its claims, but rather, that when they agree on the issue, disagreement by other interested claimant defendants, in an attempt to create a *genuine* issue of fact, may logically be viewed with some suspicion.

### Carnegie

■ The Carnegie lawsuit, as noted in f.n. 7, *supra*, arose as a result of legal services performed by Dillon, Hardamon & Cohen, and Teresa Dearing and John Dillon, with respect to the Carnegie International Corporation and its subsidiaries. On December 7, 1983, Carnegie International Corporation (one of the clients) initiated suit against Dearing, Dillon, and Dillon, Hardamon & Cohen, alleging various acts of malpractice committed in connection with the services rendered to Carnegie International Corporation.

The Insurance Corporation of America takes the position that the Carnegie claim was first made when suit was filed in December, 1983, so that policy L–15393 provides coverage. Insured Teresa Dearing's deposition testimony supports ICA's position that a claim was first made when the suit was filed and that no previous demand had been made. *See* deposition of Teresa Dearing, pp. 13–15. Dillon, Hardamon & Cohen also stated, in answer to interrogatories, that they first received notice of the claim when the lawsuit was filed in December, 1983. *See* answers of Dillon, Hardamon & Cohen to defendant Firnhaber's interrogatories, pp. 3–4, ans. 6. ICA and the insureds, as well as the Carnegie class itself, agree that the Carnegie claim was first made in December, 1983.

The Firnhaber class argues that the Carnegie claim was first made some time prior to June 24, 1983, the beginning date of policy L–15393. The position of the Firnhaber claimant defendants is based primarily upon a letter from Attorney Louis F. Cohen to the Insurance Corporation of America, dated July 7, 1983. In that letter, Attorney Cohen states that an examiner in the Chapter 11 proceeding in the Carnegie case has said that "we may have in some way committed mal-practice [sic] as it applies to the debtor. Not only do we strongly feel that there is no basis for this asserted claim but will editorially indicate that the cause of action would not even belong to the examiner." The letter goes on to state that "we therefore feel compelled particularly in view of Mr. Dillon's demise to put you on

notice that in our opinion a claim has been asserted in this matter. We will cooperate in every way to provide you with all details necessary to prepare a defense, if in fact, suit is filed or demand is made." *See* Exh. 12 to the Firnhaber submission of evidence.

The court does not think that the July 7, 1983 letter creates any genuine issues of material fact which would alter the agreement of the insurer, the insured and the claimant that the Carnegie claim was presented during the policy period covered by policy L–15393. At the outset, the court would note that the "claim" referred to in the July 7, 1983 letter is the examiner's claim that malpractice may have been committed. It was not a demand for money or specific relief of any kind. Second, the letter itself is within the period covered by policy L–15393 and there is no competent evidence to suggest that the "claim" referred to in the letter (even assuming it is a claim within the meaning of the policy) was made prior to June 24, 1983, the inception of policy L–15393. The only evidence that the "claim" referred to in the letter was known prior to June 24, 1983, is the Firnhaber claimant defendants' speculation that Cohen must have received his information from Dillon about the Carnegie matter prior to Dillons' death on June 21, 1983. But even if that was the case, any communications between Dillon and Cohen prior to Dillon's death are inadmissible under Indiana's Dead Man's Statute. *See* I.C. 34–1–14–6. Thus, the letter does not create any genuine issues of material fact regarding the timing of the Carnegie claim.

The Firnhaber defendants also point to an article published in *The Indianapolis Star* on June 12, 1983. The Firnhaber class does not take the position that the article itself contains language which shows that a claim had been made prior to June 24, 1983, but rather, that the article establishes that insureds Dillon and Dearing perceived that a claim had been made prior to June 24, 1983. This perception, according to the Firnhaber claimant defendants, was conveyed to Cohen and related by Cohen to the Insurance Corporation of America in the July 7, 1983 letter. Thus, the article arguably proves that insureds Dearing and Dillon had knowledge of the

problems relating to the Carnegie claim prior to June 24, 1983. But all of this only suggests, in a rather roundabout way, that Dillon must have known that a claim had been made prior to his death and must have communicated that knowledge to Cohen, so that Cohen also knew that a claim had been made prior to June 24, 1983. But given the Dead Man's Statute, all of this is mere speculation and it is well established now that one cannot create genuine issues by showing that there is some metaphysical doubt as to a material fact. *See Matsushita*, 106 S.Ct. at 1356. It is the court's conclusion that the Firnhaber claimant defendants have only created a metaphysical doubt and have not established a genuine issue of material fact. The Carnegie claim was first presented in December, 1983, and is therefore covered by policy L–15393.

### Graham

The court will now turn to the issue of when the Graham class presented its claim. The Graham class case originated in the United States District Court for the Southern District of Indiana. The allegations in the amended complaint pertain to a common plan or scheme to market and sell unregistered securities (in the form of a depreciable property program) by Carnegie International Corporation. The depreciable property program was orchestrated by the executives of Carnegie and was aided by affiliated professionals. The Graham class action is directed at individual officers, directors and affiliated professionals.

In the summer of 1980, Carnegie International retained the services of John Dillon and Dillon, Hardamon & Cohen to act as securities counsel for a proposed Carnegie intrastate promissory note offering. The offering was rejected by the Indiana Securities Division. However, Attorney Dillon thereafter continued to represent Carnegie and Carnegie International's efforts then shifted to the depreciable property program. The program was a huge failure, allegedly resulting in the loss of over $3,000,000 "net out of pocket" to the Graham class defendants.

The Graham class maintains that its claim was "first presented some time after December 7, 1983. On that date the Graham class filed its motion to amend its complaint, adding as additional party defendants the estate of John J. Dillon, Teresa Dearing, and Dillon, Hardamon & Cohen." *See* Graham defendants' brief in support of motion for summary judgment, dated Sept. 16, 1987. The Insurance Corporation of America agrees that the Graham class claim was presented during the policy period covered by policy L–15393, as do the individual insureds. Teresa Dearing testified in her deposition of July 2, 1987 that she did not have notice of the Graham class claim until after December, 1983. *See* deposition of Teresa Dearing, p. 77. Ms. Dillon, as representative of the estate of John J. Dillon, stated in her answers to the Firnhaber interrogatories that she did not receive notification of the claim of the Graham class defendants until the claim was filed against the estate in probate court in December, 1983. *See* Ms. Dillon's answers to Firnhaber interrogatories. The law firm of Dillon, Hardamon & Cohen, in answer to interrogatories, also confirmed that notice concerning the claim to the Graham class was first presented in December, 1983.

The Firnhaber and Bell Brothers claimant defendants make the same argument with respect to the Graham class that was made with respect to the Carnegie class; that is, that pursuant to Cohen's letter and *The Indianapolis Star* article, a claim must have been presented some time prior to the inception of policy L–15393. The analysis here is the same analysis that applies to the Carnegie class. While Attorney Cohen's letter and *The Indianapolis Star* article may create some metaphysical doubt, there are no genuine issues of material fact in dispute. Again, the agreement of the Insurance Corporation of America, the insureds, and the claimant defendants tends to belie the genuineness of any factual disputes created by Attorney Cohen's letter. Accordingly, the court holds that the Graham class claim was also presented during policy period L–15393.

*Firnhaber*

The Firnhaber claim arose as a result of a prospectus prepared by Attorney John Dillon for PAC Financial Corporation. The Firnhaber plaintiffs, who were investors in the Financial Corporation's securities brought suit against the estate of John Dillon claiming malpractice in connection with the prospectus.

ICA contends that the claim was first made in November, 1983, when the Firnhaber class filed a claim against the estate of Dillon in the Marion County Probate Court. An amended complaint, joining the estate of John Dillon as a party defendant, was filed on December 6, 1983. Anna Dillon, as personal representative of the estate of Dillon, and as the only defendant in the Firnhaber suit, stated in answer to the Firnhaber interrogatories that she first received notice of the claim of the Firnhaber class when she "received the complaint and was served with a summons." *See* Anna Dillon's answer to Firnhaber defendants' interrogatories. Like ICA and the insured, the Firnhaber class maintains that its claim was presented during the policy period covered by policy L–15393. *See* brief in support of motion for summary judgment by Firnhaber class, dated Sept. 14, 1987.

With respect to the Firnhaber class, there are no genuine issues of material fact that the claim was first presented during policy period covered by policy L–15393. Accordingly, the court holds that the Firnhaber class claim, like the claims of the Carnegie and Graham class defendants, is covered by policy L–15393.

### (b) *The Mid–America Claim*

■ The Mid–America lawsuit was filed in the Marion County Superior Court on July 20, 1983. It proceeded against the named insured, Dillon, Hardamon & Cohen, and an additional insured, Gary Colip. As noted earlier, the Mid–America lawsuit was fully settled for $105,000.

Briefly, the factual background for the Mid–America lawsuit is as follows. Early in 1982, Colip was retained by Harley Ralston and William Tulley, general partners in several Mid–America oil and gas limited partnership programs, to prepare securities

offering circulars for the partnerships. When certain problems developed concerning the offering, three purchasers of the limited partnership (Curdes, Pikel and Lauer) brought suit against the limited partnership and the general partners. These lawsuits against Mid–America and the general partners alleged that the Mid–America limited partnership securities were not registered, and that the offering circular distributed by Mid–America contained false material statements. The Mid–America partnership and general partners retained the law firm of Dillon, Hardamon & Cohen to represent their interest with respect to the Curdes, Pikel and Lauer lawsuits.

There are genuine issues of material fact with respect to the issue of when the Mid–America claim was first presented. The Insurance Corporation of America takes the position that the Mid–America claim was first presented against the insureds on June 29 or June 30, 1983, so that it is within the policy period covered by policy L–15393. But as some of the other claimant defendants point out, there is substantial evidence to suggest that the claim was made before June 24, 1983, so that it is within the preceding policy.

The most compelling piece of evidence, which alone is sufficient to create a genuine issue of material fact, is a letter dated June 8, 1983. The letter is written by Attorney Jack Brown and is addressed to Gregory Hahn, Gary Colip, and David Cutshaw. Jack Brown was retained to represent the interests of Mid–America and the general partners after Colip, Hahn, and Dillon, Hardamon & Cohen withdrew their representation. Pertinent portions of the letter are set forth below.

In examining the Prospectus in the Curdes case, we observed that the word "not" is omitted on the face of the Prospectus as well as in paragraph numbered 11 on page 13 of the Prospectus, ie, [sic] "has been registered" in lieu of "has not been registered". [Sic] Consequently, the exposure of Mid–America is not limited merely to the three investors who presently have filed suit, but to all of the investors in No. IX. Further, since we assume all of your Prospectus'

in the various offerings were done on a word processor, the same omission could have occurred on one or more of the other offerings. If the same material omission occured in the Prospectus in other offerings, the exposure of Mid–America and the General Partners is multiplied.

The Prospectus also fails to disclose payment of any commission to David Holly. Further, the Prospectus fails to disclose the profit to be earned by Trenton Development Co., Inc., and the names of its officers and their shareholdings in Trenton. In addition, the Prospectus mentions Administration and Benefit Consultants, Inc. as receiving an overriding royalty interest but fails to specify what services it is to perform or whether it is an affiliate. Finally, on page 18 of the Prospectus it is mentioned that the General Partners have served as manager [sic] in eight prior drilling finds but fails to disclose the results of the prior progress.

The foregoing enumeration is not intended to be exhaustive, but merely to enumerate some serious errors in the Prospectus prepared by your firm. Also, the Mid–America Energy Offering No. IX is subject to rescission by the Illinois Securities Commission in regard to six other purchasers in that program due to your firm's failure to make a timely filing. As the Statute of Limitations for investors is three years from the date of discovery of the omission, fraud, etc., the potential liability extends into the unforseeable future on all offerings.

The only thorough manner to correct the deficiency and errors you have made would be through a rescission offer to all the investors in Mid–America IX, and any other offering containing the same, similar, or additional deficiencies. A practical solution could be for your insurance carrier to undertake the defense of all the pending actions, probably through settlement to avoid the notoriety incident to trial, and also stand by to defend any other suits which might hereafter be filed.

Mid–America and its General Partners have a further claim against your firm and the individuals involved in regard to legal fees paid in connection with all offerings where any of the foregoing, or comparable or other omissions and errors occurred. In that connection, it will be appreciated if you will provide written documentation of the fees paid in each of such offerings, and, of course, advise your insurance carrier of this claim of Mid–America and its General Partners for refund of such sums.

\*       \*       \*       \*       \*       \*

When you became painfully aware of your errors and omissions incident to the institution of the law suits against Mid–America and its General Partners, it was apparent there was or could be a conflict of interest between the firm, yourselves, and the clients. Your continued representation of the clients and the charging of fees in these matters appear, at least on the surface, to raise serious doubts to the ethics of the situation, if not concerns of a much graver nature. Actions which appear to have been taken to protect your fees by interposing yourself into the insurance settlement compound the matter.

\*       \*       \*       \*       \*       \*

Please advise the undersigned of your insurance carriers with policy numbers, and also forward copies of this letter to their attention forthwith.

\*       \*       \*       \*       \*       \*

*See* June 8, 1983 letter of Jack Brown. This letter quite clearly identifies a number of serious errors in the prospectus prepared by the insureds. It stated that the security offerings were registered when they were not; it failed to disclose payment of any commission to David Holly; it failed to disclose profits to be earned by various interested parties; it failed to identify the relationship and the services to be provided by a consulting corporation that was to receive a royalty; and lastly, it failed to disclose the results of the general partner's services as manager in eight prior drilling funds. The letter clearly makes a specific demand; that is, a rescission offered to all investors in Mid–America IX, and any other offerings containing the same, similar, or additional deficiencies.

Jack Brown's letter, at the very least, creates genuine issues of material fact with respect to the presentation of a claim. The letter contains a specific demand for relief. The letter enumerates various acts of negligence. Moreover, the letter explicitly uses the word claim. In contrast to the claimant in *Hoyt,* 607 F.2d at 864, who wondered about an attorney's conduct, Jack Brown specifically set forth various serious errors, coupled with a very explicit demand for relief.

It is true, as ICA argues, that there is evidence to suggest that Mr. Hahn and Mr. Colip considered the June 8, 1983 correspondence from Mr. Brown to be notice of a potential claim, rather than the assertion of a claim. In a letter dated June 30, 1983, Gregory Hahn and Gary Colip wrote to the Insurance Corporation of America.

[O]ur office may be the subject of a malpractice suit by a former client known as Mid–America Energy. The potential claim is to have arisen in the Spring of 1981 and was the result of an offering memorandum which was originally produced by our office. The offering had to do with the sale of securities in the oil and gas field. Counsel for plaintiffs in the lawsuit, Curdes versus Mid–America Energy, felt that our office was responsible for substantial material mis-statements with regard to registration of the securities and that the misrepresentation is in the document because of an alleged error on the part of our office namely Messrs. Gary D. Colip and Gregory F. Hahn.

Mr. Martin T. Fletcher, counsel for the Curdes, has made a demand upon the defendant, our former client, Mid–America Energy, through Mid–America Energy's current counsel, Jack Brown and Stephen M. Coons. We feel that there is no basis for the asserted claim and will, of course, produce all the information necessary to our insurance carrier to defend our position.

Counsel for the plaintiffs has indicated through the attorney for Mid–America

Energy that unless a settlement is made forthwith they are going to file a class action for all the investors of Mid–America Energy. We, of course, wanted to give you prompt notice that a potential claim has been asserted and that you should contact counsel for Mid–America to discuss this claim....

*See* June 30, 1983 correspondence from Gregory Hahn and Gary Colip. This correspondence does suggest that Hahn and Colip regarded the June 8, 1983 letter as notice of a potential claim, rather than a claim. And it is true that both Hahn and Colip were surprised when the Mid–America lawsuit was filed. *See* deposition of Hahn, p. 94.

Hahn testified that only after he had a face to face meeting with Steve Coons (who is co-counsel with Mr. Brown), on approximately June 29 or June 30, 1983, did he feel the need to advise the Insurance Corporation of America of a potential claim. *See* deposition of Hahn, p. 97. Colip's deposition testimony is to the same effect. *See* deposition of Colip, p.p. 141–144. There is, therefore, some evidence to suggest that at least Hahn and Colip regarded the June 8, 1983 letter only as notice of a potential claim, and not as a claim itself. And it is true that the June 29 or June 30, 1983 meeting falls within the policy period covered by policy L–15393.

It seems to the court that the June 8, 1983 letter might very well prove at trial to constitute a demand, so that the Mid–America claim will ultimately fall within L 12421, the 82–83 policy year. But there is enough evidence, via the June 30, 1983 letter and the deposition testimony of Colip and Hahn, to suggest the existence of a genuine issue of material fact. There is more evidence which bears on this issue, but that evidence need not be discussed given the court's conclusion that a genuine issue of material fact exists. ICA is clearly not entitled to summary judgment on the issue of when Mid–America first presented its claim. On the other hand, the court cannot determine that the claim was first presented during the preceding policy year, the year covered by policy L–12421. This issue can only be resolved at trial.

## C. *The Carbaugh Claim*

The Carbaugh lawsuit arose out of Attorney Colip's preparation of an offering circular for the Mid–America limited partnerships. The claim is different, though, from the Mid–America claim. The Mid–America claim involved a lawsuit by the limited partnerships and general partners against Colip and against Dillon, Hardamon & Cohen. The Carbaugh lawsuit, by contrast, which was not filed until May 25, 1984, involved a lawsuit by investors in the Mid–America program against Mid–America, the general partners, Colip, and Dillon, Hardamon & Cohen. As noted earlier, the Carbaugh lawsuit was settled for $60,000.

The Firnhaber and Bell Brothers claimant defendants argue that the Carbaugh claim was presented by way of the June 8, 1983 letter discussed above. ICA, on the other hand, argues that the June 8, 1983 letter only applies to Mid–America and cannot be read to apply to Carbaugh. Instead, ICA argues, that the Carbaugh claim was presented on August 17, 1983 by way of correspondence from Jack Brown to Robert Geddes, so that it falls within policy L–15393.

The court has quoted extensively from the June 8, 1983 letter and has previously analyzed the significance of that letter with respect to the Mid–America claim. ICA argues that the June 8, 1983 correspondence is strictly limited to the potential claims of Mid–America partnerships against Hahn, Colip and Dillon, Hardamon & Cohen, by virtue of the Curdes, Pikel and Lauer lawsuits which were currently pending against the Mid–America partnership and general partners. ICA takes the position that the Carbaugh lawsuit, unlike the Mid–America lawsuit, involves claims by investors against Colip, and Dillon, Hardamon & Cohen. According to ICA, the June 8, 1983 correspondence is in no way related to any claim of any individual plaintiff in the Carbaugh lawsuit.

The Firnhaber and Bell Brothers claimant defendants argue that the June 8, 1983 letter, while not as purely applicable to the Carbaugh claim, does in fact make a claim on behalf of investors. They point to the

following language in the June 8, 1983 letter: "The only thorough manner to correct the deficiency and errors you have made would be through a rescission offer to all investors in Mid–America IX, and any other offering containing the same, similar, or additional deficiencies." The letter does, therefore, suggest at least that investors in Mid–America IX may have a claim. And the Carbaugh lawsuit, as noted earlier, did involve investors in the Mid–America program.

ICA argues, however, that the Carbaugh claim was first presented on August 17, 1983, by way of a letter written to Robert Geddes from Jack Brown, attorney for the Mid–America partnerships. In the correspondence, Brown advises Geddes that Carbaugh has filed suit against Mid–America in the Tippecanoe County Circuit Court. Brown also advised Geddes that since the matters alleged in the Carbaugh state court action are similar to the malpractice complaint, the Mid–America lawsuit, Mid–America demanded that Colip and Dillon, Hardamon & Cohen tender a defense to Mid–America in the Carbaugh state court action. ICA argues that this correspondence constitutes a claim against Colip and against Dillon, Hardamon & Cohen under ICA's policy L–15393. It specifies the parties who allegedly have been injured and identifies a specific injury relating to the Mid–America malpractice lawsuit which Brown had filed against Colip and Dillon, Hardamon & Cohen. It demands specific remedy from the insureds; that is, that they undertake the defense of Mid–America in the Carbaugh state court action. Thus, as ICA's argument goes, this correspondence constitutes a claim in the Carbaugh matter.

There are a number of problems with ICA's argument. First, the Tippecanoe county suit does not name Colip, Hahn, or the law firm as defendants. In that regard, the August 17, 1983 letter seems quite similar to the June 8, 1983 letter, which ICA strenuously argued failed to identify the specific Carbaugh parties, but rather, only identified "investors." ICA argued, pursuant to *Cornell v. Continental Casualty Co.*, 465 F.2d 22, 24–25 (9th Cir.1972), that a client cannot make an express demand for a specific remedy until such time as the injured parties (the Carbaugh plaintiffs) become identifiable and the specific injury which they allege to have suffered is identifiable. The Firnhaber and Bell Brothers claimant defendants turn ICA's argument on its head, by noting that while the June 8, 1983 letter only identifies investors, the August 17, 1983 letter fails to identify the specific defendants in the Carbaugh lawsuit. To the extent that the June 8, 1983 letter is deficient pursuant to the holding in *Cornell*, therefore, the August 17, 1983 letter also seems deficient.

ICA has not shown that it is entitled to summary judgment on the issue of when the Carbaugh claim was presented. The June 8, 1983 letter creates genuine issues of material fact with respect to the presentation of the Carbaugh claim. While the June 8, 1983 letter does not present a claim with respect to Carbaugh in as clear a fashion as it seems to present a claim with respect to Mid–America, it does create genuine issues of material fact. It clearly identifies specific acts of malpractice. It makes a very specific demand for relief. And it does identify investors in the Mid–America IX offering and other offerings containing the same, similar, or additional deficiencies.

There are some other facts to buttress ICA's position that the Carbaugh claim was presented on August 17, 1983. In correspondence to the Indiana Department of Insurance dated October 24, 1984, Insurance Corporation of America indicates that it had also accepted coverage of the claim made by William Carbaugh, because the claim was brought to its attention through a letter dated August 17, 1983. *See* Colip deposition, dated July 7, 1987, Ex. 13. But this additional fact, while it supports ICA's position, is not sufficient to establish that there are no genuine issues of material fact in dispute.

The Firnhaber claimant defendants also point to another important fact in support of their position. The Carbaugh lawsuit was not filed until May 25, 1984. ICA cancelled policy L–15393 on April 1, 1984.

If neither the June 8, 1983 letter nor the August 17, 1983 letter constitutes a claim, then a claim may not have been made until after the expiration of policy L–15393. The Firnhaber claimant defendants argue that whether the June 8, 1983 letter constitutes a claim makes little difference, since the August 17, 1983 letter clearly does not constitute a claim, so that coverage will be afforded either by a policy preceding L–15393 or by a policy following L–15393. While the court need not thoroughly explore the ramfications of the Firnhaber claimant defendants' argument, in view of the factual issues already identified, it is worth noting that the Carbaugh claim may be covered by any one of three different policies. At any event, genuine issues of material fact preclude a determination at this point of when the Carbaugh claim was presented.

### D. *The Bell Brothers Claim*

The Bell Brothers lawsuit, like the Carbaugh lawsuit, involves claims by investors in the Mid–America limited partnerships against Mr. Colip, Mr. Hahn, and Dillon, Hardamon & Cohen. The Bell Brothers' suit was filed on May 25, 1984.

The court's conclusion with respect to the presentation of the Carbaugh claim necessarily leads to the conclusion that genuine issues of material fact also exist with respect to the presentation of the Bell Brothers claim. Like the Carbaugh plaintiffs, the Bell Brothers' plaintiffs were investors. Thus, under the court's previous analysis, the June 8, 1983 letter creates genuine issues of material fact regarding the presentation of the Bell Brothers claim.

### IV.

#### *Conclusion*

Each of the policies in question provides total coverage of $1,000,000 per policy year. The Carnegie, Graham and Firnhaber claims were all presented during the policy period covered by policy L–15393. Genuine issues of material fact exist which prevent the court from determining when the Mid–America, Carbaugh, and Bell Brothers claims were first presented.