### INSURANCE CORPORATION OF AMERICA, Plaintiff,

v.

### DILLON, HARDAMON & COHEN, et al., Defendants.

#### Civ. No. F 86–104.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Jan. 19, 1989.

See also, 725 F.Supp. 1461

Charles T. Jennings, Mark R. Smith, Jennings, Maas & Stickney, Indianapolis, Ind., Edward J. Liptak, Livingston, Dildine, Haynie & Yoder, Fort Wayne, Ind., for Insurance Corp. of America.

Don A. Tabbert, Tabbert & Ford, Indianapolis, Ind., for Carnavest, Carnegie Intern. Corp., and Financial Planning Services Corp.

Alan I. Klineman, Craig Doyle, Klineman, Rose, Wolf & Wallack, P.C., Indianapolis, Ind., for Estate of John Dillon and Anna C. Dillon.

Robert W. Geddes, Hume, Smith, Geddes & Green, Indianapolis, Ind., for Dillon, Hardamon & Cohen, Gregory F. Hahn, Gary D. Colip, Teresa E. Dearing, Estate of John Dillon, and Anna C. Dillon.

Arthur G. Surgine, Jr., James J. Shea, Hunt, Sudehoff, Borror & Eilbacher, Fort Wayne, Ind., for Pacific Employers Ins. Co.

Michael J. Tosick, Greenfield, Ind., for W. Firnhaber, D. Firnhaber, J. Coons.

Dean E. Richards, Indianapolis, Ind., Vincent J. Backs, Beers, Maller, Backs, Salin & Larmore, Fort Wayne, Ind., Andrew K. Light, Scopelitis & Garvin, Indianapolis, Ind., for Bell Bros., Randy, Ronald & William Bell, Anthony & Joseph E. Cain, Larry Crowe, Catherine Crowe, Samuel Dyer, Doris Dyer, John R. Gillin, Ronald L. Hedrick, Chad Koppie, Kenneth Kindle, William Long, Charles E. Mathew, Ben F. Miller, Eugene Michael, Glenn Oberlander, Larry Oberlander, Paul Petri, Lee Seward, James Schroeder, Carol Schroeder, Clyde Sicker, D. Russell Stucker, George Warren, Jr., Gene Waibel, Patricia Waibel, Fred Spender, Edward Ander, Richard Ashby, Betty Bicknell, Eugene Streib, Betty Streib, Lawrence Castaldi, Joan Kyburz, Dale Mathew, Von Toebel Trust, David Stevenson, and Donald Morehouse.

Raymond J. Hafsten, Indianapolis, Ind., for James Furnish, Mildred Furnish, Linda Buck, T. Louis Graham, Sue H. Graham, Floyd Hayden, Freda Hayden, Dale E. Simpson, Suzanne Simpson, Mark Ellington, Thomas R. Stevenson, Larry Lichtsinn, Rita Lichtsinn, Joseph Watkins, Marcia Watkins, and Linda Ropeke.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court subsequent to an evidentiary hearing held on November 4, 1988, to determine when the claims of Mid–America, Carbaugh and Bell Brothers were first presented to the insureds. Extensive briefing of the issues has been undertaken by all involved parties. On November 14, 1988, prior to final arguments, Insurance Corporation of America (ICA) submitted several briefs concerning the issues. On November 16, 1988, the claiming defendants filed a joint post-hearing brief. Following final arguments, the claiming defendants filed a supplement to their post-hearing brief on December 2, 1988, which was followed by a reply brief from ICA filed December 5, 1988. This court, having examined the entire record and having determined the credibility of the witnesses who testified after viewing their demeanor and considering their interests, hereby enters the court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

ICA is a Texas corporation which issued four claims-made attorneys professional liability policies to the law firm of Dillon, Hardamon & Cohen [1] as the named insureds and to its attorneys as additional insureds. The policies covered periods from June 24, 1980 to June 24, 1984. [2] Each policy has a maximum coverage for the policy year of One Million Dollars ($1,000,000.00).

---

1. Dillon, Hardamon & Cohen maintained a running objection throughout the trial as to the use of "law firm" to describe their association. For purposes of this memorandum, the reference to Dillon, Hardamon & Cohen as a law firm is merely to aid in identification and is not a legal conclusion.

2. The periods covered by each policy are as follows:

| Policy L5609 | From 6/24/80 to 6/24/81 |
|---|---|
| Policy L8863 | From 6/24/81 to 6/24/82 |
| Policy L12421 | From 6/24/82 to 6/24/83 |
| Policy L15393 | From 6/24/83 to 6/24/84 |

Each of the policies in question contains a section which states that coverage shall only apply to claims presented during the applicable policy period.[3] The policies also contain a "condition" which states that the insured shall provide certain information to the insurer after an injury becomes known.[4] However, the policies do not contain a definition of either "claim" or "presentation." This court held in its order of July 18, 1988 that the term claim was not ambiguous and that its ordinary meaning was "a demand for money or property or some specific relief, accompanied by an allegation of negligence, malpractice, or some kind of wrongdoing." (Rec. 416, p. 19).

The insured firm of Dillon, Hardamon & Cohen had its principal offices in Indianapolis, Indiana. Additional insured defendants Gregory F. Hahn (Hahn) and Gary D. Colip (Colip) are attorneys licensed to practice law in Indiana and are citizens of Indiana. The remaining claiming defendants are all citizens of states other than Texas.

During 1981, the insureds were retained by Harley Ralston (Ralston) and William Tully (Tully), general partners in several Mid–America Gas & Oil Limited Partnership Programs, to prepare securities offering circulars (prospectuses) for the limited partnerships. Prospectuses for Mid–America Energy II, III and IV Oil & Gas Programs were completed by July, 1981. Prospectuses for Mid–America Energy V and VII Oil & Gas Programs were completed by August, 1981. Prospectuses for Mid–America Energy IX and X Oil & Gas Programs were completed by October 5, 1981. And the prospectus for Mid–America Energy XII Oil & Gas Program was completed by March, 1982.

The prospectuses were distributed to potential investors in each of the Mid–America Limited Partnership Programs. Investors in the Programs became limited partners bound by the Limited Partnership Agreement (Agreement). Pursuant to the Agreement, the general partners retained complete control over all business decisions.[5] Furthermore, each limited partner

---

**3.** The provision is the same in each policy and reads as follows:

  IV Policy Period
  (a) This policy is written on the "claims made" form of coverage. Thus, it shall only apply to claims presented during the policy period stated in the "declarations" page(s), provided that the acts or omissions complained of occurred after the effective date during the same policy period of a preceding ICA policy period where no break in coverage has occurred.

**4.** The pertinent language reads as follows:

  CONDITIONS
  1. Upon the insured becoming reasonably aware of any alleged injury, written notice containing the most complete information available with respect to the circumstances, time and place thereof, and name and address of the injured party shall be given to the Company as soon as practicable. If such alleged injury results in a claim being filed in court, the insured shall immediately forward to the Company the original or copy of any and all papers relating to said claim.

**5.** The Agreement is the same for each Mid–America program and reads in part as follows:

  Article III
  3.01 The General Partners shall have the full, exclusive and complete discretion in the management and control of the business of

the Partnership for the purposes herein stated and shall make all decisions affecting the business of the Partnership.
  3.02 The General Partners shall manage and control the business of the Partnership to the best of their ability and shall use their best efforts to carry out the purposes of the Partnership set forth in paragraph 2.01, and in connection therewith the powers of the General Partners include, but are not limited to, the power:

  \*     \*     \*     \*     \*     \*

  (f) To sell, dispose, trade or exchange all or any portion of the Partnership's property interests to affiliated or non-affiliated persons upon such terms and conditions and for such consideration as the General Partners deem appropriate.

  \*     \*     \*     \*     \*     \*

  Article IV
  4.01 The Limited Partners' liability shall be limited as set forth in the Indiana Uniform Limited Partnership law. The Limited Partners shall take no part whatever in the control, management, direction or operation of the affairs of the Partnership and shall have no power to bind the Partnership or transact any business in the name of the Partnership.

  \*     \*     \*     \*     \*     \*

executed a special power of attorney to the general partners giving them the power "to make, execute, consent to, swear to, acknowledge, record and/or file" any instrument pertaining to the limited partnerships as long as such did not increase the liability of the investors.[6]

About August 31, 1982, Louis and Valerie Curdes, limited partners/investors in the Mid–America Energy IX Oil & Gas Partnership (Mid–America IX), sued the partnership as well as its general partners, Ralston, Tully and Gary Woods (Woods), alleging that the partnership was not registered and that the prospectus contained false material statements.

About October 12, 1982, John Pikel, also a limited partner/investor in Mid–America IX, sued the partnership, Ralston, Tully and Woods raising the same allegations as the Curdes.

Both the Curdes' lawsuit and Pikel's lawsuit were filed by Attorney Martin Fletcher (Fletcher) alleging that Mid–America IX was not registered and that the Mid–America IX prospectus contained false material statements. Hahn entered an appearance on behalf of Mid–America IX, Ralston, Tully and Woods in Pikel's lawsuit on October 29, 1982. On November 10, 1982, Colip entered his appearance on behalf of Mid–America IX, Ralston, Tully and Woods in the Curdes' lawsuit.

In September, 1982, Colip learned from John Dillon[7] that there were problems with the prospectus prepared for the Mid–America IX offering. In February, 1983, while Colip and Hahn were representing Mid–America IX and its general partners in the above lawsuits, Fletcher sent a letter to Dillon, Hardamon & Cohen suggesting a settlement of the Curdes and Pickel lawsuits which outlined the potential liability of Mid–America due to the errors in the prospectus. The errors specifically referred to were the omissions of the word "not" and the nondisclosure of a commission paid to a Mr. Holly. Upon investigation, Colip found that the omission of the word "not" in reference to the registration did not exist in the prospectus stored on the firm's word processor or hard copies, but did exist in the copies filed with the Secretary of State. Colip further discovered that the omission existed in all of the Mid–America partnership offerings and not just the Mid–America IX prospectus. About this same time, Hahn discussed with Fletcher the potential malpractice problem

6. The Special Power of Attorney executed by each investor is the same and reads in part as follows:

NOW, THEREFORE, in consideration of the foregoing matters and intending to be legally bound hereby, the Principal hereby irrevocably constitutes and appoints Harley Ralston, (hereinafter called the "Attorney"), the true and lawful attorney of the Principal, in his name, place and stead, to make, execute, consent to, swear to, acknowledge, record and/or file all of the following:

\* \* \* \* \* \*

(2) Any certificate or other instrument which may be required to be filed by the Partnership or the Partners under the laws of the State of Indiana, or applicable laws of any other jurisdiction to the extent that the Attorney deems such filing to be necessary or desirable; provided, however, that no such certificate or instrument shall increase the liability of the Principal beyond the liability expressly set forth in the copy of the Partnership Agreement referred to in subparagraph (1) above and commitment to become a Limited Partner to which the principal has subscribed; (3) Any and all amendments or modifications of the instruments described in subparagraph (2) hereof, and subparagraph (1) hereof, to the extent of effectuating (x) the substitution of new limited partners in accordance with the terms of the Partnership Agreement, (y) the sale, assignment, or encumbrance of the partnership interest of a general partner, or the withdrawal of a general partner from the Partnership, if permitted without the consent of the Limited Partners pursuant to the Agreement or the sale, assignment, or encumbrance of the partnership interest of the Limited Partners pursuant to the Partnership Agreement. (4) All certificates and other instruments which may be required to effectuate the dissolution and termination of the Partnership pursuant to the provisions of the Partnership Agreement and the laws of the State of Indiana; provided such amendment does not require the affirmative vote of the Limited Partners.

7. John Dillon, an attorney with Dillon, Hardamon & Cohen, had been called by Fletcher who advised him that the Mid–America IX prospectus had some deficiencies in it, and shortly thereafter sent Dillon a letter reiterating the Mid–America IX prospectus problems.

for the attorneys involved in preparing the prospectus.

About May 24, 1983, both Colip and Hahn withdrew their appearances on behalf of Mid–America IX and its general partners in both lawsuits. The attorneys withdrew their appearances because Mid–America was failing to pay their fees and they felt uncomfortable in their growing distrust of statements being made by the general partners.

Subsequent to Colip and Hahn withdrawing their appearances, Attorney Jack C. Brown (Brown) entered his appearance on behalf of Mid–America IX and its general partners in the Curdes and Pikel lawsuits. Brown contacted Attorney Steven M. Coons (Coons), an attorney with expertise in securities law, who also entered an appearance on behalf of Mid–America IX and its general partners in the pending lawsuits. Brown and Coons were hired by the Mid–America Partnerships and partners Ralston and Tully on a general retainer.

On June 8, 1983, Brown and Coons drafted a letter to Colip, Hahn, Attorney David Cutshaw and Dillon, Hardamon & Cohen. At the time of drafting the letter, Brown and Coons had only reviewed the Mid–America IX prospectus, but believed that similar errors existed in the prospectuses prepared for the other Mid–America Oil & Gas Limited Partnership Programs. The letter demanded "a rescission offer to all the investors in Mid–America IX, and any other offering containing the same, similar, or additional deficiencies" and also made "a further claim against your firm and the individuals involved in regard to legal fees paid in connection with all offerings where any of the foregoing or comparable or other omissions and errors occurred." These specific demands were made in the context of the June 8 letter which reads in pertinent part as follows:

In examining the Prospectus in the Curdes case, we observe that the word "not" is omitted on the face of the Prospectus as well as in paragraph numbered 11 on page 13 of the Prospectus, ie, "has been registered" in lieu of "has not been registered". Consequently, the exposure of Mid–America is not limited merely to the three investors who presently have filed suit, but to all of the investors in No. IX. Further, since we assume all of your Prospectus' in the various offerings were done on a word processor, the same omission could have occurred on one or more of the other offerings. If the same material omission occurred in the Prospectus in other offerings, the exposure of Mid–America and the General Partners is multiplied.

The Prospectus also fails to disclose payment of any commission to David Holly. Further, the Prospectus fails to disclose the profit to be earned by Trenton Development Co., Inc., and the name of its officers and their shareholdings in Trenton. In addition, the Prospectus mentions Administration and Benefit Consultants, Inc. as receiving an overriding royalty interest but fails to specify what services it is to perform or whether it is an affiliate. Finally, on page 18 of the Prospectus it is mentioned that the General Partners have served as manager in eight prior drilling finds but fails to disclose the results of the prior progress.

The foregoing enumeration is not intended to be exhaustive, but merely to enumerate some serious errors in the Prospectus prepared by your firm. Also, the Mid–America Energy Offering No. IX is subject to rescission by the Illinois Securities Commission in regard to six other purchasers in that program due to your firm's failure to make a timely filing. As the Statute of Limitations for your investors is three years from the date of discovery of the omission, fraud, etc., the potential liability extends into the unforseeable future on all offerings.

The only thorough manner to correct the deficiency and errors you have made would be through a rescission offer to all the investors in Mid–America IX, and any other offering containing the same, similar, or additional deficiencies. A practical solution could be for your insurance carrier to undertake the defense of all the pending actions, probably through settlement to avoid the notoriety incident to trial, and also stand by to defend any other suits which might hereafter be filed.

Mid–America and its General Partners have a further claim against your firm and the individuals involved in regard to legal fees paid in connection with all offerings where any of the foregoing or comparable or other omissions and errors occurred. In that connection, it will be appreciated if you will provide written documentation of the fees paid in each of such offerings, and, of course, advise your insurance carrier of this claim of Mid–America and its General Partners for refund of such sums.

\*   \*   \*   \*   \*   \*

When you became painfully aware of your errors and omissions incident to the institution of the law suits against Mid–America and its General Partners, it was apparent there was or could be a conflict of interest between the firm, yourselves, and the clients. Your continued representation of the clients and the charging of fees in these matters appear, at least on the surface, to raise serious doubts as to the ethics of the situation, if not concerns of a much graver nature. Actions which appear to have been taken to protect your fees by interposing yourself into the insurance settlement compound the matter.

\*   \*   \*   \*   \*   \*

Please advise the undersigned of your insurance carriers with policy numbers, and also forward copies of this letter to their attention forthwith.

\*   \*   \*   \*   \*   \*

*See* June 8, 1983 letter of Jack Brown.

Upon receipt of the June 8, 1983 letter, both Colip and Hahn believed that a claim was being made against the addressees of the letter.[8] Hahn made several phone calls to Coons and arranged for a meeting. The meeting took place on June 21, 1983 between Colip, Hahn, Cutshaw, Brown and Coons. After receiving the June 8 letter, but prior to the June 21 meeting, Colip and Hahn learned that the same errors found in

the Mid–America IX prospectus existed in the Mid–America II, III, IV, VIII and X prospectuses also. The errors included not only the omission of the word "not" in reference to registration of the securities, but also included the failure to disclose the profit to be earned by Trenton Development Co., Inc. for drilling and completion of the wells.

At the June 21, 1983 meeting the parties generally discussed the problems with the Mid–America programs. Colip and Hahn admitted that the word "not" was omitted from all of the Mid–America prospectuses. Brown and Coons clearly indicated that the June 8 letter was drafted as counsel for the Mid–America Partnerships in general and not merely on behalf of Mid–America IX. Although neither Brown nor Coons had seen any Mid–America prospectuses other than IX by June 21, they strongly suspected that the same errors existed in the others. Since they lacked absolute knowledge of the other errors, they qualified their demand in the June 8 letter. By the end of the June 21 meeting, however, the demand was no longer qualified, at least as to the nonregistration error which Brown and Coons learned existed in all of the Mid–America prospectuses. Any lack of clarity that may have existed in the June 8 letter was crystal clear by the end of the June 21 meeting. A demand had been made against the insureds for errors made in all of the Mid–America prospectuses. The demand specifically sought rescission on behalf of all of the investors in the Mid–America Programs which issued erroneous prospectuses.

On about June 29, 1983, Hahn had a luncheon meeting with Coons at which they discussed Hahn's liablity exposure. During the meeting, Hahn was assured that he was not personally at risk of being sued since he had done none of the actual prospectus preparation work.

---

8. Colip and Hahn both stated in depositions taken September 3, 1986 that they did not consider the June 8, 1983 letter as a claim. However, at trial they both agreed that the letter was "a demand for money or property or some specific relief, accompanied by an allegation of negligence, malpractice, or some kind of wrongdoing." Since that was this court's definition of a claim in the July 18, 1988 order, both Colip and Hahn clarified their deposition statements and testified that the letter was a claim.

As a result of the June 8 letter and the June 21 and June 29 meetings, Hahn sent a letter on June 30, 1983 to ICA informing the insurer of potential claims [9] due to the errors discovered in the Mid–America Limited Partnership offerings. Attached to the letter to ICA was a copy of the June 8, 1983 letter from Brown and Coons. In the letter to ICA, Hahn stated that, "Counsel for the plaintiffs has indicated through the attorneys for Mid–America Energy that unless a settlement is made forthwith they are going to file a class action for all the investors of Mid–America Energy."

Three lawsuits against the insureds were generated by the errors in the Mid–America prospectuses. On July 20, 1983, Mid–America Limited Partnership Programs II, III, IV, VIII, IX and X and the general partners Tully and Ralston filed suit against Colip and Dillon, Hardamon & Cohen. On May 25, 1984,[10] a group of investors in Mid–America I, II and IV known as the Carbaugh claimants filed suit against the Mid–America Programs and general partners as well as Colip and Dillon, Hardamon & Cohen, and a group of investors in Mid–America I, II, III, IV, V, VI, VII, VIII, IX and X known as the Bell Brothers claimants filed suit against the Mid–America Programs and general partners as well as Hahn, Colip and Dillon, Hardamon & Cohen. Neither the Carbaugh nor the Bell Brothers claimants were represented by Brown or Coons at the time the suits were filed. Prior to June 24, 1983, neither the Carbaugh nor the Bell Brothers claimants had given either Brown or Coons direct permission or instruction to represent them.

Prior to filing suit against the insureds, the Carbaugh claimants filed suit on August 4, 1983 against the Mid–America Programs and general partners. On August 17, 1983, Brown, as attorney for the Mid–America Programs, sent a letter to Robert Geddes, attorney for the insureds, notifying him of the action against Mid–America by the Carbaugh claimants and making a demand "to defend this new cause ..." [11] Through correspondence to the Indiana Department of Insurance dated October 24, 1984,[12] ICA indicated that it accepted coverage of the claim made by Carbaugh "because the claim was brought to our attention through a letter dated August 17, 1983 from Mr. Jack C. Brown, representing Mid–America Energy." The letter referred to by ICA was the one Brown sent to Geddes. On August 17, 1983 when Brown sent the letter to Geddes, he did not represent the

---

**9.** ICA argues that since case law treats a "potential claim" as something less than a "claim", Hahn's reference to "potential claim" is proof that a claim had not been presented prior to June 30, 1983. However, Hahn testified that his understanding of what a claim was changed based on this court's definition in the July 18, 1988 order. Therefore, this court finds that the use of the word claim in Hahn's reference to potential claim was different from this court's definition of that word.

**10.** The parties stipulated that the date of filing of both the Carbaugh and the Bell Brothers lawsuits against the insureds was May 25, 1984.

**11.** The August 17, 1983 letter reads in pertinent part as follows:

\* \* \* \* \* \*

We further advised Mr. Kambic our present posture in this case is that we feel trial will result in defeat, primarily because of counsels' errors, which are the subject of our suit against Colip et al., and, in our professional judgment, the case should be settled as economically as possible. This we propose to do.

Since talking with Kambic we have received from Bill Tully copy of a new complaint which has just been served upon the defen-

dants Mid–America, et al. Filed on August 4, 1983, in Tippecanoe County, Circuit Court, Cause Number C–427–83, the cause is entitled "William H. Carbaugh, Ronald J. Brown, Mark Sales, Sharon Carbaugh, Barbara Carbaugh, and Charles Carbaugh, Plaintiffs v. Mid America Energy I Oil And Gas Program (A Limited Partnership), Mid America Energy II Oil And Gas Program (A Limited Partnership), Mid America Energy IV Oil And Gas Program (A Limited Partnership), Mid America Energy Corporation, Trenton Development Co., Inc., William E. Tully, and Harley Ralston, Defendants".

\* \* \* \* \* \*

Inasmuch as the basic problem arises out of the matters concerned in our suit against Colip, et al., demand hereby is made upon you to defend this new cause in Tippecanoe County.

**12.** Although ICA objected to the admission of the October 24 letter at the close of trial, the record shows that ICA stipulated to its admission when offered by the claiming defendants at the start of their case-in-chief. (Transcript, p. 140).

Carbaugh claimants; it would have been a more serious conflict of interest than when he wrote the June 8 letter since now he was representing the defendant (Mid–America) in litigation brought by Carbaugh.

On April 1, 1984, ICA cancelled coverage under policy L 15393 due to too many claims having been filed against the insureds. Although the Carbaugh action was filed after the policy's cancellation, ICA granted coverage of that claim because it was presented by the August 17, 1983 letter from Brown to Geddes, and thus fell within the shortened policy period of June 24, 1983 to April 1, 1984. On June 15, 1984, ICA denied coverage for the Bell Brothers action filed on May 25, 1984 as being a claim made outside of the policy period.

After considerable correspondence with ICA and the state of Indiana Department of Insurance, Colip, Hahn and Dillon, Hardamon & Cohen filed a declaratory judgment action against ICA on April 4, 1985, seeking coverage for the Bell Brothers claim. In January, 1986, Colip, Hahn and Dillon, Hardamon & Cohen entered into a settlement agreement with ICA whereby coverage of the Bell Brothers claim was granted under policy L 15393. The stipulation expressly stated that ICA denied any legal liability to the insureds.

On March 28, 1986, ICA filed its "Complaint in Interpleader, for Declaratory Judgment, and for Injunction" in this court. ICA alleged that six malpractice lawsuits had been filed against the insureds. These included the Mid–America, Carbaugh and Bell Brothers actions previously discussed and the Carnavest, Firnhaber and Graham lawsuits which dealt with allegations of malpractice unrelated to the Mid–America prospectuses.

Prior to filing this court action, ICA settled the Mid–America claim for $105,000 and settled the Carbaugh claim for $60,000. ICA interpled the amount of $835,000 into the Registry of the court as the maximum amount still due under policy L 15393 after the settlement of the Mid–America and Carbaugh claims. The basis for interpleading this amount is ICA's contention that all six lawsuits were claims made between June 24, 1983 and June 24, 1984; the one policy year covered by policy L 15393.

In this court's July 18, 1988 order, 725 F.Supp. 1461, this court held that the Carnavest, Firnhaber and Graham claims were first presented to the insureds during the period of coverage of policy L 15393. The issue before the court on this evidentiary hearing is when were the claims of Mid–America, Carbaugh and Bell Brothers first presented within the intendment of the ICA claims-made attorneys professional liability policies.

## CONCLUSIONS OF LAW

As indicated above, this is a declaratory judgment action. This court accordingly has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, as well as diversity jurisdiction under 28 U.S.C. § 1332.

Once again this court is faced with the task of determining what the ICA policy means by presentation of a claim. In the court's July 18, 1988 order, the term claim, as used in the policy at issue, was analyzed and defined. At that time, this court determined that there was a material issue of fact in dispute as to when the Mid–America, Carbaugh and Bell Brothers claims were first presented to the insureds. This court has since conducted an evidentiary hearing and received extensive briefing by the parties. Adopting the analysis in the July 18 order, the court will now decide when each of the claims was first presented.

Based on the court's definition of claim and the testimony of Colip and Hahn clarifying their understanding of a claim, the June 8, 1983 letter from Brown and Coons undeniably presented a claim. The letter contained a specific demand for relief and enumerated various acts of negligence as well as explicitly using the word claim. Furthermore, Colip and Hahn were reasonably aware that the demand was being made. It would be totally unrealistic for a reasonable person, having these two attorney's knowledge of the pervasive errors in the Mid–America offerings, to be unaware

of the existence or extent of the demand. The remaining unresolved issue, however, is *whose* claims were presented by the June 8 letter.

### I. Mid–America Claim

ICA takes the position that to the extent that the June 8 letter presented a claim it only presented a claim for Mid–America IX since the drafters had not seen (and therefore had no knowledge of) errors in the other Mid–America offerings. ICA further supports its position by noting that the letter only refers to known errors in Mid–America IX. ICA's position places an additional requirement on the court's definition of claim; it requires that the party making the demand have specific knowledge of the alleged negligence, malpractice or wrongdoing.

ICA's position fails for two reasons. First, ICA's reliance on *Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864 (9th Cir.1979) and *Bensalem Township v. Western World Ins. Co.*, 609 F.Supp. 1343 (E.D. Pa.1985), is misplaced. ICA argues that *Hoyt* and *Bensalem* stand for the proposition that the insureds cannot subjectively turn a request for more information into a claim. The argument runs that since the June 8 letter essentially requested more information about all of the other Mid–America offerings it cannot present a claim for them just because Colip and Hahn knew of the extensive errors.

However, in both *Hoyt* and *Bensalem,* the courts found that the letters involved merely requested information, and specifically stated that the letters did not make any demands.

In *Hoyt,* the court stated:

No claim in the form of a demand was made until suit was brought after expiration of the policy period.

607 F.2d at 866.

In *Bensalem,* the court held that:

Neither the letter nor the attached charge of discrimination requested money or other relief; neither document stated that a lawsuit was to follow ... Nei-

ther the letter nor the charge, however, purported to be such a demand.

609 F.Supp. at 1348.

ICA's argument completely disregards the fact that the June 8 letter specifically demands rescission and refund of preparation fees for "any other offering containing the same, similar, or additional deficiencies." Clearly, neither *Hoyt* nor *Bensalem* covers the situation before this court. Therefore, the fact that Colip and Hahn knew of the extensive deficiencies in the Mid–America Programs is appropriate to a determination that it was reasonable to believe that the June 8 letter presented a claim for all of the Mid–America offerings. The insurance policy itself supports this result in that it makes specific reference to "the insured becoming reasonably aware of any alleged injury", but makes no mention anywhere of the claim presenter's state of mind.

The second problem with ICA's position is that it completely ignores the significance of the June 21 meeting. At that meeting Colip and Hahn informed Brown and Coons that the nonregistration problem existed in all of the Mid–America offerings. Even if ICA were correct in requiring specific knowledge by the claim presenter, such knowledge was given to Brown and Coons at the June 21 meeting. ICA contends that Brown and Coons lacked sufficient knowledge because they had not seen the other prospectuses and therefore could not allege errors in them. This argument confuses the difference between knowing something to be true and being able to prove it. Obviously, when Colip and Hahn told Brown and Coons that the errors existed in the other prospectuses, Brown and Coons' strong suspicions became knowledge. The fact that Coons still wanted to see the other prospectuses before actually filing suit is only reasonable; especially in light of the fact that he and Hahn were good friends.[13]

The June 8 letter (which made a specific demand for Mid–America IX and "any oth-

---

13. Coons testified at the hearing and in his deposition that he and Hahn were good friends and in deference to that friendship he was being

very thorough before making any allegations as to the other Mid–America offerings.

er offering containing the same, similar, or additional deficiencies") coupled with the knowledge exchanged at the June 21 meeting (that other Mid–America offerings were similarly faulty) presented the entire claim for the Mid–America Programs prior to June 24, 1983. Therefore, the Mid–America claim was not made within the period of coverage of policy L 15393.

## II. Carbaugh Claim

ICA recognized the presentation of the Carbaugh claim by the August 17, 1983 letter from Brown to Robert Geddes,[14] thus placing the claim under coverage of policy L 15393. ICA now argues that the June 8 letter could not have presented the Carbaugh claim because neither Brown nor Coons had the authority to present a claim on behalf of any limited partners/investors in the Mid–America Programs.

While recognizing the blatant inconsistency in ICA's position, the defendants proceed to argue various theories under which Brown and Coons had authority to present the claim for rescission for the investors. The court has been inundated with briefs, responses, replies and supplements addressing the issue. Upon close examination, however, the authority issue appears to be only tangentially relevant.[15]

Under all of the ICA policies issued to Dillon, Hardamon & Cohen, coverage is triggered when a claim is first presented to an insured. The policy language fails to define or limit "presentation"; it does not prevent the first presentation of a claim by a non-beneficiary of the demand being made.

ICA bases the entire authority issue on its reading of two cases, *Burlington County Abstract v. OMA Associates*, 167 N.J.Super. 398, 400 A.2d 1211 (1979) and

*National State Bank, Etc. v. Am. Home Assur.*, 492 F.Supp. 393 (S.D.N.Y.1980). ICA contends that those cases establish that under a claims-made insurance policy, a claim is personal, and therefore, can only be presented by the injured party or his agent. Applying that statement of law to the facts of this case, ICA argues that each investor in the Mid–America Programs had to present his own claim or have his agent do so. Since neither Brown nor Coons were agents of any of the investors, their demand could not present any investor's claims.

While ICA's logic is reasonable, it is premised upon a faulty expansion of the holding in *National State Bank* and *Burlington County Abstract*. Both of those cases referred to claims made *by the insureds* to the insurance companies and both dealt with "per claim" limits of liability and deductible amounts in the policies. Neither case involved when presentation of a claim was made, and in each case the court specifically based its holding that each claim was separate and distinct on a thorough analysis of the policy language, which in both cases was different from that in the ICA policy. None of this translates into ICA's contention that presentation of a claim *to the insureds* is separate and distinct requiring each injured party or his agent to present the claim.

The risk insured against by a claims-made policy is the risk that a claim will be brought. *Bensalem Township v. Western World Ins. Co.*, 609 F.Supp. 1343, 1349 n. 8 (E.D.Pa.1985). Absent policy language to the contrary, whether a claim is brought or not depends on a reasonable assessment of the circumstances of each particular case.

**14.** ICA argued in its trial brief that the Carbaugh claim was first presented when suit was filed on May 25, 1984. However, the evidence clearly shows that ICA recognized the presentation of the Carbaugh claim by the August 17, 1983 letter from Brown to Geddes.

**15.** Even if the authority issue were more significantly relevant, this court finds that Brown and Coons had such authority to present the claim on behalf of Carbaugh and Bell Brothers. Coons testified that the June 8 letter was written

by the attorneys in their capacity as counsel for the Mid–America Partnership in general and for the general partners. The Mid–America Limited Partnership Agreements give the general partners complete control over all business decisions of the partnerships. Furthermore, each limited partner executed a special Powers of Attorney to the general partners enabling them to sell, assign or encumber the partnership interest. The June 8 demand for rescission offer falls within the power of the general partners to act on behalf of each limited partner.

Obviously, if Brown and Coons were authorized agents of the investors it would be reasonable to believe that a demand for rescission made by them would represent a claim by the investors. Even without authority, however, facts exist which make it reasonable to conclude that Brown and Coons' demand for rescission presented a claim by the Carbaugh claimants.

First, the insureds were not ordinary, lay persons. They were experienced attorneys who specialized in the practice of securities law. As such, they possessed the knowledge that a rescission offer could only be made to investors. The nature of the demand for a rescission offer clearly identified the parties who were to benefit from, and had a right to assert, the claim. All of the investors in the Mid–America Programs having same, similar or additional deficiencies as those in Mid–America IX would be the recipients of the demanded rescission offer.

Secondly, ICA provides a basis for reasonably recognizing the June 8 letter as presenting the Carbaugh claim. In its motion for summary judgment, ICA argued that the August 17 letter sufficiently presented the Carbaugh claim against the insureds. ICA noted that the letter specified the parties who were allegedly injured, identified a specific injury related to the Mid–America deficiencies, and demanded a specific remedy. However, the lawsuit referred to in the August 17 letter did not name any of the insureds. Further, the remedy which demanded a tender of defense for Mid–America, was not a demand by or on behalf of the Carbaugh claimants. In contrast, the June 8 letter clearly makes a demand on behalf of the Carbaugh claimants—they are the investors referred to; they benefit directly from the demand made. The June 8 letter also clearly identifies the insureds and alleges with specificity the acts of negligence, malpractice or wrongdoing. If ICA can recognize a claim presented by a letter containing significant technical deficiencies, it is reasonable to recognize one only flawed by its failure to name the investors individually.

Finally, ICA's failure to define presentation in the claims-made policies issued to the insureds created an ambiguity. Even if ICA's position is equally as reasonable as the claimants', this court must find in favor of the non-drafters of the policy. The terms of an insurance policy should be interpreted most favorably for the insureds where an ambiguity exists. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985). Further, the ambiguous language should be interpreted to further the insurance policy's purpose of indemnity by strictly construing the language against the insurer. *Id.* Therefore, presentation of the Carbaugh claim was made by the June 8 letter which demanded that a rescission offer be made in all of the Mid–America Programs containing deficiencies allegedly caused by the insureds. The Carbaugh claim, thus, was not presented under policy L 15393.

### III. Bell Brothers Claim

The Bell Brothers claimants, like the Carbaugh claimants, are all investors in Mid–America Programs which issued faulty prospectuses. As such, all of the reasoning in part II of this order is applicable to the issue of when the Bell Brothers claim was first presented. Therefore, as investors in the troubled Mid–America Programs, the Bell Brothers' claim was first presented by the June 8 letter. Thus, the Bell Brothers claim also does not fall within coverage of ICA policy L 15393.

### CONCLUSION

On the basis of the foregoing, the court concludes that the Mid–America, Carbaugh and Bell Brothers claims were first presented prior to the policy period covered by policy L 15393.